# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| WASHINGTON STATE HUMAN RIGHTS COMMISSION, presenting the case in support of the complaint filed by JOSEPH MITCHELL,<br><br>                Appellant,<br><br>   v.<br><br>SUMMERWALK HOMEOWNERS' ASSOCIATION; J & M MANAGEMENT, LLC; XIOMARA MONTES,<br><br>                Respondents. | No.  61643-2-II<br><br><br><br>PUBLISHED OPINION |

PRICE, A.C.J. — In 2024, the Washington State Human Rights Commission (Commission) filed a complaint against Summerwalk Homeowners' Association, J & M Management LLC, and Xiomara Montes (collectively, Summerwalk) for violation of Washington's Law Against Discrimination[1] (WLAD).  The complaint alleged that Summerwalk discriminated against Joseph Mitchell, a homeowner in the Summerwalk neighborhood, based on his race.  According to the complaint, Summerwalk had enforced its rules and covenants in a disparate manner and treated Mitchell worse than other homeowners because he is Black.  The complaint was brought under a statute that gave the Commission jurisdiction to pursue claims of discrimination related to "real

---

[1] Chapter 49.60 RCW.

estate transactions." The disparate enforcement of the homeowner covenants, the complaint alleged, was related to a "real estate transaction."

The complaint was filed with the Office of Administrative Hearings and heard by an administrative law judge (ALJ). The ALJ, however, dismissed the Commission's claim, reasoning that homeowners' association's (HOA) covenant enforcement was not sufficiently related to a real estate transaction. The Commission appeals.[2]

Whether Summerwalk engaged in discriminatory practices is not before us. Rather, this appeal raises a narrow question of first impression—whether an HOA's discriminatory enforcement of its rules and covenants is the type of conduct that is prohibited by WLAD. We hold that it is. Accordingly, we reverse the ALJ and remand for further proceedings.

FACTS

I. WASHINGTON'S LAW AGAINST DISCRIMINATION

Our legislature enacted WLAD to eliminate and prevent discrimination within the state. RCW 49.60.010. It found that discrimination threatens not only the rights of individuals but also the institutions and foundation of a free and democratic state. RCW 49.60.010. Our Supreme Court has repeatedly described WLAD as a policy of the "highest order" and the "highest priority," and it has noted how the legislature has expanded WLAD's protections since its initial enactment.[3]

---

[2] The superior court certified the Commission's appeal for direct review by the Court of Appeals.

[3] *Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles*, 148 Wn.2d 224, 246, 59 P.3d 655 (2002) ("This court has held that the purpose of the WLAD—to deter and eradicate discrimination in Washington—is a policy of the highest order.") (internal footnote omitted); *Jin Zhu v. N. Cent. Educ. Serv. Dist.–ESD 171*, 189 Wn.2d 607, 614, 404 P.3d 504 (2017) (noting how actions brought under WLAD are " 'vindicating a policy of the highest priority' " (quoting *Marquis v. City of Spokane*, 130 Wn.2d 97, 109, 922 P.2d 43 (1996))); *Suarez*

"To further this important purpose, both the legislature and Washington courts require that even in a plain language analysis, WLAD's provisions must be given 'liberal construction.' " *Jin Zhu v. N. Cent. Educ. Serv. Dist.–ESD 171*, 189 Wn.2d 607, 614, 404 P.3d 504 (2017) (quoting *Marquis v. City of Spokane*, 130 Wn.2d 97, 108, 922 P.2d 43 (1996)).

Our legislature also created the Human Rights Commission to effectuate WLAD's purpose. RCW 49.60.010. The Commission has "general jurisdiction and power" over matters regarding the

> elimination and prevention of discrimination in employment, in credit and insurance transactions, in places of public resort, accommodation, or amusement, and in real property transactions because of race, creed, color, national origin, citizenship or immigration status, families with children, sex, marital status, sexual orientation, age, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability . . . .

RCW 49.60.010. The Commission has the authority to promulgate rules and regulations and to investigate complaints alleging discrimination. *Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles*, 148 Wn.2d 224, 237, 59 P.3d 655 (2002); RCW 49.60.120.

When investigating a complaint, the Commission acts as an impartial body with "no predisposition in favor of either complainants or respondents." WAC 162-08-061(1). It seeks to determine whether, based on its factual findings, there is "reasonable cause" or "no reasonable cause" of unfair practices as defined by WLAD. *Id.* "If 'reasonable cause' is found, then the

---

*v. State*, 3 Wn.3d 404, 414-15, 552 P.3d 786 (2024) ("Since its passage, the WLAD has been amended several times, and, with its amendments, the legislature expanded the list of protected classes and protected areas.").

objective of the commission is to obtain the remedy that will best eliminate the unfair practices and prevent their recurrence." *Id.* This usually involves the Commission seeking a remedy that "restor[es] the complainant as nearly as possible to the position [they] would be in if [they] had not been discriminated against." WAC 162-08-061(2). The Commission generally begins this process by trying to come to an agreement with the respondent; however, if those negotiations fail, the Commission's complaint and findings will be typically referred to the Office of Administrative Hearings for adjudication. *See* RCW 49.60.250(1); RCW 34.12.010.

## II. AUTHORITIES AND POWERS OF HOAS

HOAs are private organizations of neighbors designed to provide certain services to the housing community, create "uniformity and comradery of like-minded groups," and increase and maintain the community's property values.[4] Saige Culbertson, Note, *Your HOA Does Not Work for You: Why HOAs Are Not Agents and Do Not Owe Fiduciary Duties*, 47 OKLA. CITY U.L. REV. 113, 118 (2022). The first HOAs that emerged during the 1940s often sought to preclude the sale of homes to historically marginalized groups through racially restrictive covenants. *Id.* at 115. Although significant progress has been made with the passage of antidiscrimination laws, remnants of this legacy remain in modern-day HOAs. *Id.* at 116-17. A 2019 study showed that HOA communities are still more racially segregated than non-HOA communities with almost 75 percent

---

[4] Sources often use different terms to describe HOAs depending on whether they are referring to private associations governing condominium complexes or individual houses in the same neighborhood. *See, e.g.*, Gemma Giantomasi, Note, *A Balancing Act: The Foreclosure Power of Homeowners' Associations*, 72 FORDHAM L. REV. 2503, 2505 (2004) (distinguishing between "condominium developments" and "HOAs" as distinct types of "property owner associations"). For the purposes of this opinion, we use the term "HOA" to broadly describe any association governing a group of residential properties—whether they be individual homes, condominium units, or townhomes.

of residents being white. *Id.* at 117. These findings suggest that HOAs can still "serv[e] as a tool for exclusion of some groups" by way of either facially discriminatory rules or selectively enforcing the rules against homeowners of color. *Id.* at 117, 150 ("Selective enforcement claims are especially common among minority homeowners facing suits brought by their HOA.").

HOAs often function as "quasi-governmental" entities. *Id.* at 135-36. They are generally founded under governing documents such as articles of incorporation, covenants, or bylaws—similar to state governments being bound by their constitution or codes. Gemma Giantomasi, Note, *A Balancing Act: The Foreclosure Power of Homeowners' Associations*, 72 FORDHAM L. REV. 2503, 2506 (2004). HOAs often provide public services to their members that might ordinarily be provided by local governments. Culbertson, *supra*, at 118-19. HOA services can include things such as trash collection or snow removal, maintenance of common areas, and access to shared amenities. *Id.* at 119. Depending on its governing documents, an HOA's authority can range from being able to fine a resident for failing to comply with acceptable paint colors and landscaping to being able to foreclose on a property due to an owner's failure to pay their dues. *See id.* at 119, 139-40, 155. Upon purchasing a home in a neighborhood with an HOA, homeowners are typically required to become members and to be bound by the HOA's governing documents. *See* Giantomasi, *supra*, at 2508.

While " 'the advantages of private associations are their efficient decision making and the responsiveness of the government to local concerns,' " there is also more limited oversight or safeguards that can prevent abuses of authority and selective enforcement of HOA rules. Culbertson, *supra*, at 119 (quoting Ron Cheung, *Homeowners' Associations and Their Impact on the Local Public Budget*, *in* MUNICIPAL REVENUES AND LAND POLICIES 338, 343 (Gregory Ingram

& Yu-Hung Hon eds., 2010)); *see also* Culbertson, *supra*, at 150; Jeffrey Kleeger, *Liberty and Separation of Powers in Judicial Review of Privatized Governance Regimes*, 38 J. NAT'L ASS'N ADMIN. L. JUDICIARY 57, 59-60 (2018).

III.  THE COMMISSION'S COMPLAINT AND ITS DISMISSAL BY THE ALJ

Mitchell purchased a townhome in the Summerwalk Duets Development on January 1, 2020.  The closing documents for the purchase required Mitchell to be bound by the development's HOA's covenants, conditions, and restrictions (CC&Rs).

Eleven months after his purchase of the townhome, in November 2020, Mitchell made a report with the Commission, which alleged that Summerwalk was discriminating against him on the basis of his race through its enforcement of its CC&Rs.  Following an investigation, the Commission found "reasonable cause" to believe that Summerwalk had discriminated against Mitchell; accordingly, after being unable to reach an agreement with the parties, the Commission filed a complaint with the Office of Administrative Hearings.  Admin. Rec. (AR) at 8.

The Commission's complaint alleged that Summerwalk's enforcement of the CC&Rs against Mitchell "differed" from how it enforced them against the other homeowners and that he was treated "worse" than white homeowners.  AR at 17.  The complaint further alleged that this disparate treatment subjected Mitchell to "unwelcome conduct" and "a hostile living environment" that "interfered with the enjoyment of his Townhome" and caused him both economic and emotional damages.  AR at 19.

As the case proceeded, the ALJ "developed concern" that the Commission and, by extension the ALJ, lacked jurisdiction regarding the complaint.  AR at 590.  Following a hearing set to consider the issue, the ALJ dismissed the Commission's complaint, determining that the

alleged discriminatory conduct did not pertain to a "real estate transaction" as contemplated by WLAD, and thus the Commission did not have jurisdiction to investigate it or bring its enforcement action before the ALJ. AR at 591, 594.

The ALJ's written order explained that an HOA's failure to enforce its rules was not within, nor sufficiently related to, the plain language definition of "real estate transaction" and thus failed to fall within WLAD's scope. The ALJ acknowledged that WLAD contains broad protections concerning real estate transactions; however, it concluded that WLAD's protections regarding real estate transactions "do[] not reach subsequent use of the property." AR at 594.

The Commission appeals.

ANALYSIS

The Commission argues that the ALJ erred in concluding that Summerwalk's conduct "was not connected with a real estate transaction" and thus was outside the Commission's jurisdiction to investigate. Opening Br. at 14. The Commission contends that WLAD's plain language, Washington case law, and persuasive federal case law interpreting the Fair Housing Amendments Act of 1988[5] (FHAA) "all demonstrate that the WLAD covers discriminatory enforcement of HOA rules against a homeowner after a home is purchased." Opening Br. at 14. We agree.

---

[5] 42 U.S.C. §§ 3601-3619.

I. THE COMMISSION'S AUTHORITY TO INVESTIGATE MITCHELL'S ALLEGATIONS

As an initial matter, the Commission faults the ALJ for casting its decision as a matter of jurisdiction rather than an issue about the merits. The Commission asserts that jurisdiction pertains to only the type of controversy that it may investigate, not whether the claim will be successful. We agree with the Commission.

The jurisdiction of an administrative agency differs from that of the superior court. While the superior court has general jurisdiction to decide any justiciable controversy unless another court has jurisdiction, an administrative agency "must act within the scope of its jurisdiction as defined by the statute conferring authority upon it." *Compare* RCW 2.08.010, *with Smith v. Dep't of Licensing*, 19 Wn. App. 2d 419, 427, 496 P.3d 1195 (2021), *review denied*, 199 Wn.2d 1013 (2022).

When determining whether an agency has subject matter jurisdiction over a particular issue, we look at whether the case in question concerns the *type of controversy* contemplated by the relevant statute. *Singletary v. Manor Healthcare Corp.*, 166 Wn. App. 774, 782, 271 P.3d 356, *review denied*, 175 Wn.2d 1008 (2012). The "type of controversy" refers to "the general category of controversies [an agency] has authority to decide and is distinct from the facts of any specific case." *Id.* " '[Agencies] do not lose subject matter jurisdiction merely by interpreting the law erroneously.' " *Marley v. Dep't of Labor & Indus.*, 125 Wn.2d 533, 539, 886 P.2d 189 (1994) (quoting *In re Marriage of Major*, 71 Wn. App. 531, 534-35, 859 P.2d 1262 (1993)).

WLAD grants the Commission subject matter jurisdiction to investigate and adjudicate alleged violations of WLAD, including those related to real estate transactions. *See* RCW 49.60.010, .120; *Fraternal Ord. of Eagles*, 148 Wn.2d at 237.

No. 61643-2-II

Here, Mitchell alleged that his HOA was discriminating against him based on his race. This complaint, being rooted in discrimination based on race and arguably involving a real estate transaction, is within the type of controversy that the Commission has subject matter jurisdiction to investigate. Even if it was later determined that the Commission's investigation (or resulting orders) was outside the scope granted by WLAD because Mitchell's complaint was too attenuated from an underlying real estate transaction, the dismissal of the claim would be based on the merits (what is or is not sufficiently related to real estate transaction), not the Commission's subject matter jurisdiction. *See Marley*, 125 Wn.2d at 539 (explaining that "subject matter jurisdiction" means that an agency has the power to issue a decision on a claim, even a decision that is later found to be erroneous).[6] Thus, the ALJ's reliance on the absence of jurisdiction as the basis for its decision was error.

If the ALJ had limited its decision merely to broad concepts of jurisdiction, we could end our analysis here. However, as part of the ALJ's misinterpretation of its and the Commission's jurisdiction, the ALJ proceeded to address the merits of whether Mitchell's claim involved a "real estate transaction" within the meaning of RCW 49.60.222 and RCW 49.60.2235. Thus, we continue our analysis to address the question raised by Mitchell's claim; that is, whether an HOA's discriminatory enforcement of its rules and covenants is prohibited by WLAD.

---

[6] As we have recently noted, the term "jurisdiction" is one of " 'many, too many, meanings.' " which has led to inconsistent use of the term. *Spanaway Concerned Citizens v. Pierce County*, ___ Wn. App. 2d ___, 590 P.3d 1166, 1172 n.5 (2026) (Veljacic, J. concurring) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)). We use the term "subject matter jurisdiction" here consistently with the " 'rightfully sweeping definition' " of the term as discussed in *Marley*. 125 Wn.2d at 539 (quoting *Major*, 71 Wn. App. at 534-35).

II. WHETHER WLAD PROTECTS AGAINST THE DISCRIMINATORY ENFORCEMENT OF HOA RULES

A. STANDARDS OF REVIEW AND RULES OF STATUTORY INTERPRETATION

    1. Appellate Review of Administrative Actions

The Administrative Procedure Act[7] governs judicial review of decisions made by an agency or administrative board. RCW 34.05.510; *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). The party challenging an agency's actions bears the burden of demonstrating that the action is invalid. *Tafoya v. Hum. Rts. Comm'n*, 177 Wn. App. 216, 222-23, 311 P.3d 70 (2013). "We may reverse an agency action if the agency erroneously interpreted or applied the law, or if the order is not supported by substantial evidence." *Id.* at 223. We review whether the agency misinterpreted or misapplied the law de novo. *Alstom Power, Inc. v. Dep't of Revenue*, 26 Wn. App. 2d 36, 44, 525 P.3d 855 (2023).

    2. Statutory Interpretation

Interpretation of a statute's meaning or purpose is a question of law that we review de novo. *Rodriguez v. Zavala*, 188 Wn.2d 586, 591, 398 P.3d 1071 (2017). The goal is to carry out the legislature's intent. *Id.*

When practicable, we must refer to a statute's plain meaning as an expression of the legislature's intent. *Associated Press v. Legislature*, 194 Wn.2d 915, 920, 454 P.3d 93 (2019). A statute's plain meaning is discerned from "the text of the provision itself, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." *Rodriguez*, 188 Wn.2d at 591. "We may not add words to a statute and must construe it in a way

---

[7] Ch. 34.05 RCW.

that gives effect to all the language within the statute." *Hum. Rts. Comm'n v. Hous. Auth. of Seattle*, 21 Wn. App. 2d 978, 985, 509 P.3d 319 (2022). "In undertaking this plain language analysis, the court must remain careful to avoid 'unlikely, absurd or strained' results." *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005) (quoting *State v. Stannard*, 109 Wn.2d 29, 36, 742 P.2d 1244 (1987)).

Only when a statute's language is ambiguous and could be interpreted in multiple ways do we turn to statutory construction, legislative history, and relevant case law to ascertain its meaning. *McClain v. State*, 34 Wn. App. 2d 247, 266, 567 P.3d 1109 (2025). It is not enough that two or more interpretations be "conceivable," they must be reasonable and consistent with the statute's clear legislative purpose. *State v. Brown*, 194 Wn.2d 972, 976, 978, 454 P.3d 870 (2019) (holding that defendant's interpretation of the meaning of "when required" in the statute although "conceivable" was unreasonable in part because it undermined the purpose of the traffic law and public safety).

B.    WLAD's Plain Language Includes Protection Against the Discriminatory Enforcement of HOA Rules and Covenants

As relevant to this case, WLAD makes it unlawful to racially discriminate against someone in the context of a real estate transaction. RCW 49.60.030(1)(c), (2). WLAD defines a "real estate transaction" as one that "includes the sale, appraisal, brokering, exchange, purchase, rental, or lease of real property, transacting or applying for a real estate loan, or the provision of brokerage services." RCW 49.60.040(22). This lengthy list of what constitutes a "real estate transaction" is not a limitation; it is "illustrative, but not exclusive." *McFadden v. Elma Country Club*, 26 Wn.

App. 195, 201, 613 P.2d 146 (1980). Using this definition, WLAD makes it unlawful, in a similarly expansive description, for any person

> [t]o discriminate against a person in the terms, conditions, or privileges of a real estate transaction *or in the furnishing of* facilities or *services in connection therewith*[.]

RCW 49.60.222(1)(b) (emphasis added).

Here, the Commission argues that, especially given the legislature's instruction that WLAD's provisions be "construed liberally," the plain language of RCW 49.60.222(1)(b) "covers post-sale enforcement of community rules by HOAs." Opening Br. at 22. The Commission supports its broad view by highlighting how the text of WLAD itself uses broad and inclusive language when defining the scope of its protections in order to effectuate its purpose. It points out, for example, that the definition of "real estate transaction" *includes* multiple examples of what can constitute a real estate transaction but does not limit the definition to only those examples.

Summerwalk responds that the Commission's position expands the scope of WLAD's real estate transaction provision beyond reason. Summerwalk contends that the scope of this provision " 'does not reach beyond the acquisition of the property' " and " 'does not reach subsequent use of the property.' " Br. of Resp'ts at 23 (quoting AR at 594). According to Summerwalk, an HOA's enforcement of its covenants well after the property sale "has no relationship to, effect, or impact on the sale, purchase, appraisal, financing, brokering, or rental of [a] property" and "has no bearing on one's ability to engage in a real property transaction or access housing on equal footing as others." Br. of Resp'ts at 19. Summerwalk emphasizes that it was never a party to Mitchell's purchase of his townhome or any other type of real estate transaction with him, and "at best" its subsequent enforcement of its CC&Rs was merely "a possible consequence" of the purchase itself.

Br. of Resp'ts at 19. Boiled down, Summerwalk essentially argues that by the time covenants are being enforced against the homeowner, the dust has long since settled on the underlying real estate transaction.

We are persuaded by the Commission's position. Resolving the plain meaning of WLAD's real estate transaction provision must be driven by the breadth of the statute. As noted above, both our legislature and our Supreme Court have instructed that the provisions of WLAD must be viewed broadly and given "liberal construction." RCW 49.60.010; *Jin Zhu*, 189 Wn.2d at 614.

When we view the operative section with this lens, the breadth of the language is striking—WLAD reaches discrimination "in the terms, conditions, or privileges of a real estate transaction *or in the furnishing of* facilities or *services in connection therewith*." RCW 49.60.222(1)(b) (emphasis added). HOA's covenant enforcement, both its privileges and burdens, having its roots in the original real estate purchase transaction, meets this definition. Covenant enforcement is plainly a "service in connection" with a real estate transaction—so long as a broad "liberal construction" of the statutory language is used.

Moreover, we are unpersuaded that we should read into WLAD temporal limitations that do not exist. *See Hous. Auth. of Seattle*, 21 Wn. App. 2d at 985. There is no language in WLAD or RCW 49.60.222(1) that suggests that discrimination relating to real estate transactions must occur either before or during the acquisition of property. Such a limited reading would not only go directly against the legislature's explicit instruction to construe WLAD liberally but would also have the potential to bring about the " 'unlikely, absurd, or strained' " result of placing large swaths of discriminatory conduct outside of WLAD's protection. *Burton*, 153 Wn.2d at 423 (quoting *Stannard*, 109 Wn.2d at 36).

Here, Mitchell was bound by Summerwalk's CC&Rs and subject to Summerwalk's enforcement powers as a direct result of his purchase of his townhome and the documents required for that transaction. Because of this ongoing connection to his purchase, the HOA's conduct was within the furnishing of services in connection to a real estate transaction (Mitchell's purchase of his home). Accordingly, we hold that the plain language of RCW 49.60.222(1)(b) includes Summerwalk's enforcement of its CC&Rs against Mitchell.[8]

C. WASHINGTON CASE LAW AND APPLICABLE FEDERAL CASE LAW FURTHER SUPPORT OUR CONCLUSION

1. Washington Case Law

Our conclusion that the Commission's complaint is consistent with the plain language of WLAD is in accord with other Washington cases, which have applied RCW 49.60.222 to a "broad range of situations." *Hous. Auth. of Seattle*, 21 Wn. App. 2d at 987.

For example, in *McFadden*, this court held that membership in a country club was a real estate transaction where membership was required for a homeowner to access their property. 26 Wn. App. at 201. While the *McFadden* court acknowledged that membership to a country club "is not a conventional 'sale or exchange,' " it reasoned that the legislature intended RCW

---

[8] The Commission also argues that Summerwalk's alleged discrimination falls under the type of conduct prohibited by RCW 49.60.2235. RCW 49.60.2235 provides, "It is an unlawful practice to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, rights regarding real estate transactions secured by RCW . . . 49.60.222." Because RCW 49.60.2235's protections, in the context of this appeal, are entirely derivative of those in RCW 49.60.222, we focus our inquiry solely on interpreting RCW 49.60.222.

49.60.222 " 'to cover every possible real property transaction without exception.' " *Id.* (quoting Hum. Rts. Comm'n, Declaratory Ruling No. 9, 1 Hum. Rts. Rep. IC-11 (1974)).

Similarly, in *Housing Authority of Seattle*, Division One of this court also held that the administration of Section 8 vouchers,[9] "at the very least" is included in RCW.49.60.222(1)(b)'s " 'service[ ] in connection' " to a real estate transaction because it "enables" a person to rent real property (a real estate transaction). 21 Wn. App. 2d at 986 (alteration in original) (quoting RCW 49.60.222(1)(b).

Moreover, in *Tafoya*, this court addressed whether "the furnishing of facilities or services" must be connected in time to the actual transfer of property in a real estate transaction. 177 Wn. App. at 224. There, in the context of a lease, the court rejected the argument that the "services connected" to the real estate transaction must be provided contemporaneously with the transfer of property and held that RCW 49.60.222(1)(b) also protects against discriminatory conduct that happens at any time during the term of the tenancy. *Id.* at 225. The court explained that a narrow construction of the statute which included a temporal limitation "would create an absurd result that could not have been intended by the legislature and that clearly defies the mandate to construe the WLAD broadly to prevent discrimination."[10] *Id.*

---

[9] "Section 8 is a federally funded program that provides residential rent subsidies to low-income tenants for securing rental housing on the open market." *Nichols v. Seattle Hous. Auth.*, 171 Wn. App. 897, 899, 288 P.3d 403 (2012).

[10] Summerwalk spends much of its briefing relying on an unpublished decision, *Branchick v. Melrose Station Homeowners' Ass'n*, No. 56999-0-II (Wash. Ct. App. Aug. 22, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2056999-0-II%20Unpublished%20Opinion.pdf. However, not only do we find *Branchick* unpersuasive because of its factual dissimilarities, we generally do not discuss unpublished decisions. GR 14.1(c) ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or

2. Analogous Case law under the FHAA

Our conclusion is also consistent with federal case law interpreting a federal statute that is remarkably similar to WLAD—42 U.S.C § 3604(b) of the FHAA.

In the late 1960s, Congress enacted the FHAA to combat high rates of racial segregation and unequal housing. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 528-30, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015). The FHAA sought to ensure fair housing throughout the United States and " 'provide[] a clear national policy against discrimination in housing.' " *Id.* at 539 (quoting H.R. Rep. No. 100-711, at 15 (1988)). The United States Supreme Court has said that the FHAA has a " 'broad and inclusive' compass" and therefore is afforded " 'generous construction,' " while its exceptions must be read narrowly. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731-32, 115 S. Ct. 1776, 131 L. Ed. 2d 801 (1995) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 212, 93 S. Ct. 364, 34 L. Ed. 2d 415 (1972)).

In very similar language to WLAD, § 3604 of the FHAA specifically makes it unlawful

> to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(b).

---

discuss unpublished opinions in their opinions."); *Mendez v. Palm Harbor Homes, Inc.*, 111 Wn. App. 446, 473, 45 P.3d 594 (2002) (" 'The reliance upon unpublished opinions is a dubious practice at best, and we decline the invitation under the present circumstances.' " (quoting *State v. Sparkman & McLean Co.*, 16 Wn. App. 402, 406, 556 P.2d 946 (1976))). Accordingly, we do not further discuss it.

Because § 3604 contains "virtually identical language" to RCW 49.60.222(1)(b), we may look to federal cases interpreting it as guidance.[11] *See Hous. Auth. of Seattle*, 21 Wn. App. 2d at 987 (noting that federal case law interpreting the FHAA was consistent with the court's plain language reading of RCW 49.60.222); *Tafoya*, 177 Wn. App. at 224 ("When interpreting Washington law, we may look to the federal case law when a federal antidiscrimination law contains the same protections and mandates the same broad construction.").

In addressing the same issue before us in this appeal, multiple circuits have held that the FHAA's prohibition of discriminatory conduct extends beyond the timeframe of the acquisition of property. *See, e.g.*, *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 714 (9th Cir. 2009) (concluding that § 3604(b) applies to post-acquisition claims); *Bloch v. Frischholz*, 587 F.3d 771, 779-81 (7th Cir. 2009) (HOA's selective enforcement of its rules was prohibited under § 3604(b) because the HOA's "power to restrict [the] owners' rights flow[ed] from the terms of the sale"); *Ga. State Conf. of the NAACP v. City of LaGrange, Ga.*, 940 F.3d 627, 631-32 (11th Cir. 2019) (rejecting argument that "§ 3604(b)'s reach is limited only to

---

[11] Summerwalk urges us to reject the persuasiveness of federal case law by arguing that the FHAA provides broader protections than WLAD because it uses the term "sale or rental of a dwelling" instead of merely "real estate transaction." Br. of Resp'ts at 25 (emphasis omitted). We disagree that this is a basis to reject the persuasiveness of this federal law. As highlighted by the Commission, WLAD defines a "real estate transaction" to include the "sale or rental of a dwelling" among a non-exhaustive list of many other types of transactions—making WLAD's protections broader than those of the FHAA. Opening Br. at 35. Moreover, our Supreme Court has also stated that "[t]o the extent the WLAD differs from federal antidiscrimination statutes, this court 'has almost always ruled that the WLAD provides greater . . . [antidiscrimination] protections than its federal counterparts.' " *State v. City of Sunnyside*, 3 Wn.3d 279, 317, 550 P.3d 31 (2024) (alterations in original) (quoting *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 491 n.14, 325 P.3d 193 (2014).

discriminatory conduct that takes place prior to or at the moment of the sale or rental" because "there is no temporally limiting language" in § 3604(b)).

For example, similar to *Tafoya*, in *City of Modesto*, the Ninth Circuit rejected the idea that § 3604 of the FHAA "differentiated between claims based on whether the alleged discrimination occurred at the time of or after the acquisition of the housing." 583 F.3d at 711. The Ninth Circuit reasoned that such a limitation was both contrary to the plain language of the statute (and subsequent regulations) and inconsistent with the legislature's intent when enacting the statute. *Id.* at 713. It explained that nowhere in the statute did it specify that discrimination had to occur at or before the moment of sale. It reasoned that the language of § 3604 actually suggested the opposite:

> The inclusion of the word "privileges" implicates continuing rights, such as the privilege of quiet enjoyment of the dwelling. While defendants argue that "the provision of services or facilities in connection therewith" refers only to services or facilities provided at the moment of acquisition in connection with the sale or the rental, this is hardly a necessary reading. There are few "services or facilities" provided at the moment of sale, but there are many "services or facilities" provided to the dwelling associated with the occupancy of the dwelling. Under this natural reading, the reach of the statute encompasses claims regarding services or facilities perceived to be wanting after the owner or tenant has acquired possession of the dwelling.

*Id.* (Notably, RCW 49.60.222(1)(b) also includes the word "privileges," barring discrimination "against a person in the terms, conditions, or *privileges* of a real estate transaction . . . ." (emphasis added)).

Additionally, the Ninth Circuit expressed concerns that "limiting the [FHAA] to claims brought at the point of acquisition would limit the act from reaching a whole host of situations that . . . would constitute discrimination in the enjoyment of residence in a dwelling or in the provision

of services associated with that dwelling." *Id.* at 714. The court described the harms that could occur from such a narrow reading, warning that it

> "would not violate § 3604(b) for a condominium owners' association to prevent a disabled person from using the laundry facilities or for a landlord to refuse to provide maintenance to his Hispanic tenants. Similarly, it would not violate § 3604(b) for a landlord to sexually harass a tenant or to raise the rent of only Jewish tenants. It would not violate § 3604(c) for a landlord to use racial slurs to or about existing tenants or to spray-paint such a slur on an occupant's door. Nor would it violate § 3604(c) for a homeowners association to print up flyers denigrating a particular resident due to her religious faith and post them throughout the neighborhood."

*Id.* (quoting Rigel Oliveri, *Is Acquisition Everything? Protecting the Rights of Occupants Under the Fair Housing Act*, 43 Harv. C.R.-C. L. REV. 1, 32-33 (2008)).

The Eleventh Circuit reached the same decision in *Watts v. Joggers Run Prop. Owners Ass'n, Inc.*, 133 F.4th 1032, 1042-43 (11th Cir.2025). There, a woman sued her HOA for discriminatory enforcement of its covenants based on her race. *Id.* at 1040. She contended that following her purchase of the property, the HOA had harassed the woman and her family—limiting access to HOA meetings, parking, and the property's shared basketball court—to the point where the woman "had no other option but to move . . . ." *Id.* at 1037-38.

The *Watts* court held that the HOA's discriminatory enforcement of the HOA's rules was sufficiently related to the woman's purchase of the home or the "provision of services or facilities in connection therewith." *Id.* at 1042-43; *see also id.* at 1037-38. It reasoned that the woman's access to HOA meetings and the building's amenities was part of the "privileges, services, and facilities" associated with the purchase of her home based on the rules of the HOA. *Id.* at 1043-44. These "contractual rights flowing from her HOA membership were 'directly connected to the sale' of her home." *Id.* at 1043 (quoting *City of LaGrange*, 940 F.3d at 634).

These federal cases, construing "virtually identical language" to RCW 49.60.222(1)(b), all provide persuasive support for our conclusion about the plain language of WLAD's real estate transaction provision.

CONCLUSION

In the end, we hold that Mitchell's allegations against Summerwalk are broadly within the type of controversy that the Commission has jurisdiction to investigate because they allege discrimination based on a protected class and allege that the discrimination occurred in the context of a real estate transaction.

We also hold that RCW 49.60.222(1)(b) includes discriminatory enforcement of HOA covenants, even after the sale of property has concluded. This decision is supported by both the plain language of the statute and the broader policy goals of WLAD. HOAs wield immense power over homeowners that are subjected to their rules. With this power, there is the potential, like in *Watts*, for an HOA to enforce its rules to the point where a person is constructively forced out of their own property. 133 F.4th at 1038. If Summerwalk's construction of WLAD (which would limit protections to be only those actions temporally tied to the acquisition of property) was adopted, "a whole host" of discriminatory conduct would fall outside the protections of WLAD. *City of Modesto*, 583 F.3d at 714.

When Mitchell purchased his townhome, he was obligated to join his HOA and to become subject to its CC&Rs. This created an ongoing relationship between Mitchell and his HOA, and he received "services" from it on this on-going basis. Thus, although the HOA's enforcement of its covenants occurred after he purchased the home, this enforcement "flow[ed] from the terms of the sale." *Bloch*, 587 F.3d at 780.

20

No. 61643-2-II

Accordingly, the conduct alleged by the Commission was sufficiently related to a real estate transaction to meet the requirements of RCW 49.60.222(1)(b).  We reverse the ALJ and remand the case for further proceedings consistent with this opinion.

PRICE, A.C.J.

We concur:

MAXA, J.

CHE, J.